Bloom v. State.

----

LOUIS BLOOM V. STATE OF NEBRASKA.

FILED APRIL 3, 1914.  No. 18,296.

1.  Criminal Law: NEW TRIAL: NEWLY DISCOVERED EVIDENCE.  A new
    trial will not be granted in a criminal case on the ground of
    newly discovered evidence, unless it is made to appear that the
    newly discovered evidence is material, is not doubtful in character,
    and that the defendant could not by the exercise of reasonable
    diligence have discovered and produced it at the trial.

2.  ――――: WITNESSES: NECESSITY OF CALLING.  It is not required
    that all the witnesses whose names are indorsed upon an informa-
    tion must be called at the trial.

3.  ――――: RECEIVING STOLEN GOODS: EXISTENCE OF CORPORATION:
    PROOF.  In a prosecution for knowingly receiving goods which had
    been stolen from the freight cars of a railroad corporation while
    being transported, strict proof as to the existence of the cor-
    poration is unnecessary.  It is sufficient to show that the company
    named in the information was, at the time charged, operating
    the railroad, and that the goods sold were stolen from freight
    cars upon its tracks.  This establishes its *de facto* existence,
    which is sufficient.

4.  ――――: REFUSAL OF INSTRUCTION.  It is not error to refuse an
    instruction, where another one is given by the court upon its
    own motion covering the ground.

5.  ――――: INSTRUCTIONS: FAILURE TO REQUEST.  It is not reversible
    error for the court to fail to instruct as to the defense of alibi,
    where the defendant makes no request for such instruction.

ERROR to the district court for Richardson county:
JOHN B. RAPER, JUDGE.  *Affirmed.*

Bloom v. State.

*James E. Leyda, Edwin Falloon* and *T. J. Doyle,* for plaintiff in error.

*Grant G. Martin, Attorney General, Frank E. Edgerton* and *Reavis & Reavis,* contra.

LETTON, J.

Plaintiff in error was convicted upon the charge of buying stolen property, knowing that the property was stolen. He brings the case here for review.

The first contention made is that there is not sufficient evidence to sustain the verdict. It is impossible, within the proper limits of this opinion to set forth all the evidence. Plaintiff in error, hereafter called the defendant, had a small shop or store in Falls City for the sale of clothing, notions, etc.

The testimony in behalf of the state is to the effect that the goods, consisting of a large number of overalls, a number of boxes of cigars and some tobacco, were stolen from freight cars of the Chicago, Burlington & Quincy Railroad Company standing in the railroad yards at Falls City, and that the thieves, Norman and Merle Bonner, sold them to the defendant on or about Sunday, July 21, 1912; that Norman Bonner told him at the time that the property was stolen; that the marks or tags were afterwards removed from a number of the overalls and were intermingled by Bloom with other overalls on the shelves; and that, when the officers asked for the goods he got from the Bonners, Bloom showed them where the overalls were, and went into a back room and brought them a valise filled with the stolen cigars.

The testimony for the defense is that the goods were left in the store by Norman Bonner to be called for; that Bloom was in the country when they were left, Mrs. Bloom being in charge of the store and giving him permission to leave them; that the goods were not intermingled, but the bundle of overalls brought by Bonner was placed on a shelf by itself, covered with a black cloth; that none of them were sold by the Blooms, and no money was ever paid for them.

Several witnesses testify Bloom was at a farm five miles from Falls City on Sunday, July 21, 1912. Part of the testimony of the Blooms is so strongly impeached by other credible witnesses that it tends to weaken their whole story, and this probably had its effect with the jury.

While there is a direct conflict in the testimony, we think it was ample to support the verdict, if the jury believed the witnesses for the state.

It is next assigned that the sheriff was disqualified to select talesmen on account of his bias and prejudice against the defendant. It is shown that all that the sheriff had to do with the selection of the jury was to call five talesmen to fill the panel at the beginning of the term of court at which the trial was had. There is no showing that any of these talesmen were jurors, and no showing of any misconduct on the part of the officer.

Misconduct of counsel is next complained of. One Whitaker, a witness for defendant, was called to testify to the reputation and character of defendant. After testifying that he considered his reputation good for honesty and morality, he was asked by counsel for the state: "Don't you know the city wouldn't let him run a pawnshop down there?" This was objected to, and the objection sustained. He was also asked whether he had heard of the trouble that Bloom had had with a machinist about a ring. This was also objected to, and the objection sustained. The nature of the questions themselves was not out of the ordinary; no attempt was made to carry on this line of questioning after the court sustained the objections; and we find no prejudice to defendant in this matter.

The fourth assignment is that the court erred in not granting plaintiff a new trial on the ground of newly discovered evidence. The affidavit of one V. D. Kelso is to the effect that on a Sunday in July, 1912, when he went to deliver ice to Mrs. Bloom, he met Norman Bonner in Bloom's store; that at that time there were one or two bundles lying on the floor in the room; and that Bloom was not there. At the trial Norman Bonner testified that Kelso was an iceman and lived in Falls City, and that he was in the room

at one time when Bloom paid him money for the goods. We see no reason why a subpœna could not have been issued for Kelso at any time after Bonner testified. A party cannot, with knowledge of the existence of a witness within reach of a subpœna, refrain from calling him, and then, after a trial has been had resulting in an adverse verdict, procure a new trial on the ground of newly discovered evidence. The affidavit of one Foster is also filed to the effect that one day in July he picked up a pair of overalls from a bunch on the shelf, and that he asked Mr. Bloom the price; that defendant replied they were not his overalls, at the same time calling Foster's attention to overalls on another shelf, which he stated were his, and which he would sell, and saying, referring to this pile of overalls and a grip, that they had been "left there by a fellow last Sunday," and the "fellow hadn't come after them yet." This affidavit is inconsistent with the testimony of both Mr. and Mrs. Bloom, since, according to their testimony, the stolen overalls were covered with a black cloth as soon as placed upon the shelf and during the time they were in the store. Furthermore, this conversation is said to have occurred several months before the trial. Bloom says he had forgotten the man with whom he spoke; but there is no showing that he made any effort to find this man before the trial. Foster was a resident of Falls City, and it would seem that soon after the trial was had his affidavit was obtained. We think due diligence in the endeavor to procure the testimony of these witnesses before the trial has not been shown, and doubt that, if received, it would affect the result.

It is next complained that, because the name of Merle Bonner was upon the information, he should have been called to the stand by the state, and that failure to do so is reversible error. There is no statutory requirement in this state that makes it incumbent upon the state to call witnesses whose names are indorsed upon an information. Furthermore the record discloses that Merle Bonner is deficient in mentality, and that, if he had been called by the prosecution the defense might have had a good reason

to complain of the action of the state in attempting to use the testimony of such a witness in order to convict the defendant. He was called as a witness by the defendant, but his testimony is so incoherent and inconsistent with itself in several respects as to demonstrate the inadvisability of his being called as a witness, either by the state or the defendant.

What is said in this connection applies to the complaint that, since Merle Bonner was a hostile witness, the court erred in refusing to permit the defendant to impeach him by showing that he had made statements at the preliminary, trial inconsistent with his present testimony. Moreover, the witness was permitted to testify to several statements he had made at the preliminary, and questions asked, to which objections were sustained, did not tend to impeach.

Complaint is made of instructions Nos. 1 and 2 that they omitted to state the issue as to whether the Chicago, Burlington & Quincy Railroad Company was a corporation, and the issue of an alibi. Instruction No. 1 merely states the allegations of the information. Instruction No. 2 informs the jury of defendant's plea of not guilty, and gives the law as to the presumption of innocence and the duty of the state to prove guilt beyond a reasonable doubt. There is no error in this instruction.

Instruction No. 2 is also complained of for the same reasons. This instruction restates the material allegations of the information, and directs the jury to acquit the defendant if these are not established beyond a reasonable doubt. There is no error in this instruction. With respect to the claim that neither the instructions of the court nor the evidence cover the allegations in the information that the property was stolen from a corporation it may be said that the information charged that the Chicago, Burlington & Quincy Railroad Company was a corporation, and the proof established that a company known by the name given in the information was as a matter of fact carrying on the business of transportation under such name. This is sufficient evidence of the identity of the owners of the property. In Braithwaite v. State, 28 Neb. 832, this court cited with

approval and followed the case of *Burke v. State,* 34 Ohio St. 79. In that case the accused was charged with breaking into a railroad car of the Pittsburg, Cincinnati & St. Louis Railroad Company. There was no allegation in the indictment that the company was a corporation. The court held that "it is sufficient to prove by reputation that there was, at the time when the crime is alleged to have been committed, a corporation known by that name, operating such road, and carrying goods, stock, and passengers for hire in its cars running along said company's road. A *de facto* existence of the corporation is only necessary to be shown." In this case the information alleged the corporate character of the railroad company, and the proof established its *de facto* existence. That is all that was required.

It is assigned that the court erred in refusing to give instruction No. 5, to the effect that, although the wife may have known the goods were stolen, this would not be sufficient to justify the jury in returning a verdict of guilty, although the defendant may have passively consented to what his wife had done without taking any part in the transaction. There was no evidence in the case to which such an instruction was applicable. No claim is made, and no one testified, that Mrs. Bloom ever purchased any goods. Instructions should have reference to the evidence in the case, and there was no error in this refusal.

Complaint is also made that the court failed to instruct the jury as to the defense of an alibi. No request was made to instruct upon this issue, and under such circumstances the failure to do so was not reversible error. *Heidelbaugh v. State,* 79 Neb. 499; *Ferguson v. State,* 52 Neb. 432.

The assignment that the court erred in permitting proof as to the shipping of a trunk containing a part of the stolen goods to Beatrice by Bonner is also untenable. The evidence was corroborative, and, while collateral in its nature and somewhat remote, it was within the discretion of the trial court to admit the same. Unless an abuse of discretion is shown which results in prejudice to the rights of the accused, a reviewing court will not interfere with the judgment on this account.

Complaint is made of the refusal to instruct, at defendant's request, that "the witnesses Merle Bonner and Norman Bonner are accomplices," and to caution the jury that for that reason their testimony should be acted upon with great care and caution. The testimony of both the Bonners showed that they were convicted criminals. Their answers to questions and the nature of their testimony clearly demonstrated to any man of ordinary intelligence that their testimony was of such a nature that it should be closely scrutinized. No sensible man would accord their testimony unless corroborated by circumstances or by credible testimony a tithe of the weight which would be accorded to that of an ordinary witness. We think that, while the court might with propriety have instructed the jury to use caution in considering their testimony, it would be an insult to their intelligence to hold that the refusal to give such an instruction was prejudicial, and that a new trial should be granted for such reason. Moreover, it may be doubted whether the tendered instruction is an accurate statement of the law where, as in this state, the crime charged is a substantive offense. 24 Am. & Eng. Ency. Law (2d ed.) note 1, p. 51.

In the reply brief it is complained that a lawyer aided in the prosecution who had not been appointed by the court for that purpose. This point should have been made in the main brief, and we are not bound to consider it. At the trial defendant was represented by two able and experienced counsel who made no objection. After a trial and conviction has been had, it is too late to interpose such an objection, and the right to object to other counsel participating has been waived.

Under section 9050, Rev. St. 1913, it is provided that "no indictment shall be deemed invalid nor shall the trial, judgment or other proceedings be stayed, arrested, or in any manner affected," for any "defect or imperfection which does not tend to the prejudice of the substantial rights of defendant upon the merits." Under section 9065, Rev. St. 1913, the provisions of the code in relation to indictments shall, as near as may be, "apply to informations, and all

prosecutions and proceedings thereon." None of the matters complained of have operated "to the prejudice of the substantial rights of the defendant upon the merits."

The judgment of the district court is therefore

AFFIRMED.

HAMER, J., dissenting.

The principal witness in this case, Norman Bonner, swore that he was an inmate of the Iowa penitentiary, and before that that he was in the Missouri penitentiary. He claims to have been convicted of felonies three times. He seems to have been permitted to go to Joplin, Missouri, to the deathbed of his mother. There he escaped from the guards and took his 18-year old brother to Kansas City with him, and then to Falls City, Nebraska, where he broke into the freight cars of the Chicago, Burlington & Quincy Railroad Company and proceeded to steal. He is shown to be a professional thief. He claims that he sold the stolen goods to the defendant Bloom. Bloom was keeping a little store at Falls City. The charge is that he (Bloom) purchased personal property belonging to the Chicago, Burlington & Quincy Railroad Company, knowing that the same had been stolen, and with the intent to defraud the owner. I do not like to send anybody to the penitentiary on the testimony of such a witness as Bonner, and especially if he is contradicted and also contradicts himself. Both is done in this case. His story is in many respects unreasonable and improbable. While the facts should be found by the jury, the reviewing court cannot be expected to shut its eyes to the incongruous things pictured by the witness, nor is it expected to be deaf when the witness with particularity relates what is improbable, and his testimony is controverted as far as it goes. One of the improbable things in his statement is that he made *seven trips* to the store on this particular Sunday. He claimed to be *carrying up the goods*. It is unlikely that any man of intelligence would go seven times into a store with grips on Sunday. He would be almost sure to attract the attention of the public. He also claimed that part of the time he went

in where there was a board off in the *back fence, and came out at the front.* That would be equally likely to attract attention. He claimed to have got acquainted with Bloom when Bloom was at Lincoln. He claimed the acquaintance orignated through Bloom's *crooked work,* but on further examination it seems that he had never seen Bloom while he lived at Lincoln. Later on he did not know whether Bloom had ever lived at Lincoln or not. He testified that he never bought any goods of Bloom while he lived at Wymore; that he never sold him any while Bloom was living at Wymore. When closely pressed as to how he came to get acquainted with Bloom he said: "If I would tell you I would incriminate some of my partners." A little later on he claimed that he stole these particular goods *because Bloom asked him to.* The evidence shows that he came direct to Falls City, and therefore *he had no opportunity to see Bloom.* He testified that he broke into the cars *before* he got to Falls City; that he broke into the cars *on the way* to Falls City. He seems to have lost no opportunity to avoid telling the truth. He cheerfully testified that after he got to be 18 or 20 years old he was in the penitentiary most of the time. He testified that he was making the trips to Bloom's store on Sunday all day. The other brother said the defendant only made three trips. Norman Bonner testified that there were other people in the front room that day; that Bloom and himself would go in the back room, and then come out into the *front room to settle up;* that would be before people. It is not a very likely story that they would settle there in the presence of a crowd of people, but, of course, if Bloom was guilty, they may have done so. He testified that Bloom paid him about $80, and that it was mostly paid in silver. He testified that he gave the money to his brother. His brother testified that Norman *never gave him any money,* neither that day, nor the next day, nor at any time. Norman seems to have kept all of it, if there was any. Norman testified that he carried up two grips each trip on that Sunday. Sadie Halbert testified that the defendant, Louis Bloom, was out to their house on that day; that he came

out about half past 10 or 11 o'clock, and that he left at 4 or 5 in the afternoon. William Honea testified that he was at Louis Halbert's house on Sunday, the 21st of July, when Bloom came there about half past 10 or 11; that Bloom ate his dinner there, and left between 4 and 5 o'clock that afternoon. W. H. Guilliams testified that he knew Bloom, and saw him at Halbert's on that Sunday; that he ate dinner with him. Jesse Smith testified that he worked for Louis Halbert, and saw Bloom there at Halbert's house that Sunday, July 21, 1912; that Bloom came down to the sawmill where he was at work. Mrs. Bloom's statement that the goods were brought there in a big bundle is not unreasonable. The cigars were in a grip. She denies that Bonner came into the store the back way. The defendant testified to making the trip out to Halbert's place, and that he was there on the 21st day of July, 1912; that he did not see at his store either Merle Bonner or Norman Bonner until the officers came after the goods; that he never bought any goods of either one of the boys; that he never sold any goods in the store that did not belong to him; that he never sold any cigars out of the valise; that he never opened the valise. He also testified that there was no fence between the back part of the building and the alley; that it had always been open. This was a fact or it was not a fact. If it was not a fact, it was easy to show it. Amos E. Gantt thinks the fence may have been there, but is uncertain. John Wilson testified that he did not recollect ever seeing a fence at the rear of Bloom's premises; that there might have been a fence at one time, but there had not been one there for the *last several years*.

This is very rickety testimony upon which to send a man to the penitentiary, even if he is described as a Jew by the young man who voluntarily confesses that he is himself a burglar and a thief, and who tries by his testimony to bring Bloom down to a level with himself. This young man Bonner not only makes an assault upon this particular Jew, but he makes an assault against a large number of Jews, when he testifies that they are in the habit of buying stolen goods. He was probably testifying in that way for

the purpose of securing the conviction of Bloom.  As he had not seen Bloom before for many months, nor recently until after the goods were stolen, that was a subject upon which he probably had a good deal of anxiety.  He seems to have indicated this anxiety.  He characterized the Jews as being in the habit of buying stolen goods, and then spoke of Bloom as a Jew.  In addition to that, he tried to create the impression, without any apparent foundation for doing so, that he and Bloom had been guilty of crooked transactions together in Lincoln.

It is in evidence that the defendant Bloom has the reputation of being a law-abiding citizen.  That is all the reputation he could have, even if he had belonged to another race and had a different religion.  "Though good reputation of accused does not prove innocence, it carries weight where the proof is doubtful and circumstantial."  *Gerke v. State,* 139 N. W. 404 (151 Wis. 495).

It would seem that the trial court was not quite fair to him.  Counsel for the defendant requested the following instruction:  No. 10:  "The jury are instructed that the witnesses Merle Bonner and Norman Bonner admit that they stole the goods which they testified were sold to Bloom.  By their own testimony they are accomplices and their testimony should, for that reason, be acted upon with great care and caution, and if, after a careful examination of their testimony, the jury are not satisfied that it is true, and do not believe that they can safely rely upon it, then the jury should return a verdict of not guilty."  These witnesses must have been of the most unsatisfactory character.  It was the duty of the court to caution the jury against them.  This the court did not do.  The fact that it did not do so does not seem to be fair.  The jury had the testimony of these witnesses before them.  It went to them under the sanction of the court.  The mere fact that the court let it in compelled the jurors to consider it.  It is easy to say that these witnesses were unworthy of belief, but how does the jury know that so long as no one tells them?  When the court let this sort of evidence go before the jury, it

stood sponsor for the fact that it was to be considered. The jurors are not lawyers; they are simply jurymen.

The defendant requested the giving of the following instruction: No. 5: "The jury are further instructed that, although the wife may have known or thought the goods at the time she bought them were stolen, this would not be sufficient to justify you in returning a verdict of guilty, though the defendant may have passively consented to what his wife had done without taking any active part in the matter." This instruction, or one similar to it, should have been given. This is a case where there should be a *discrimination between the defendant and his wife.* Under the testimony for the defense, only the wife was there at the time the goods were brought into the store. Whatever she said and whatever she did was not binding upon her husband. The jury should have been told that fact. It should be remembered that the jury were composed of men who are not lawyers. They were likely to receive the impression that the husband's act acquiescing in the purchase made by his wife bound him, and, if it did, he would be criminally liable, although he was not present and had nothing to do with the transaction.

It is a familiar rule that the defendant is entitled to have his theory of the case go before the jury.

Merle Bonner is weak-minded. It is stated by counsel in some of the objections made that he had been in the Institution for Feeble-Minded. He swore that he was eighteen years old the 18th of October; that his parents were both dead; that he had not gone to school very much; that he could read a little, "not to amount to anything;" that he understood that the clerk wanted him "to swear against the Jew." Undoubtedly there was an atmosphere there about the court that was unfriendly to the Jew, and, although this witness was only half-witted, he felt the pressure. He testified that they (his brother and himself) changed from a passenger car to a freight car as they were coming up to Falls City and before they got there, and that they *did it to get these goods;* that his brother suggested

95 Neb. 46

getting the goods. It will be remembered in this connection that Norman Bonner testified that Bloom *told him to steal the goods.* Of course, if Norman suggested stealing the goods before they arrived at Falls City, Norman swearing that Bloom *told him to steal the goods is all a fiction.* When they got to Falls City, he testified, the goods were thrown out along the side of the track down by the stockyards. He says this was at 4 or 5 o'clock in the morning.

Eaton testified that he went to Bloom's store; that Aldrich said, "Bloom, get those goods you got from these boys;" that then Bloom started around and commenced getting the overalls, and that his wife stepped up and said, "I'll get them; you wasn't here." Eaton testified that the overalls were not covered up. "Q. Isn't it a fact there was some kind of clothing, I don't know what it was, over these overalls at the time and they were all taken out from that covering? A. No, sir; they wasn't."

L. L. Aldrich, the chief of police, testified that he went to the store along with Eaton, Johnson, and Merle Bonner; that "we were back there helping him, and Mrs. Bloom told him (her husband) to get out of the way when he went to get them." She said that she put the goods there, and that he was not there when the goods were left at the store.

Mrs. Bloom testified that the overalls were brought to the store on Sunday, the 21st of July; that her husband was out of town that day; that he had gone out to the country about half past 8 or 9 o'clock in the morning, and he did not return until 7 or 8 that evening; that one of these boys asked her if they could leave the bundle, and she said, "yes;" that this bundle was tied with a rope, and that one could see that it was overalls. She says that she untied the rope and put the overalls on the shelf, and that she put the suitcase that had the cigars in it under the lower shelf; that she did not know how many pairs of overalls there were; that she never sold any of them; that to her knowledge her husband never sold any of them. She describes the overalls *as a great big bundle;* she says the overalls were all in one pile; she says she cut the rope that was around the bundle; she testifies that she *untied the pack*

and put the overalls up on the shelf because they *were in her way; she put the cover on the overalls;* that her husband had nothing to do with it. She testified that she got the suitcase when the men came in and asked for it. It will be seen from her testimony that *she* assumed the management of delivering the goods to the chief of police; that she was inclined to crowd her husband to one side on the theory that *she knew* where the goods were, and that the *package* had been *left* with her.

The defendant testified that he first learned from his wife about the overalls and the suitcase being there; that he did not know about it until the Monday morning after they were brought there.

If the court had liberty to refuse this instruction, then it was at liberty to deny the defendant the privilege of being heard. I cannot sufficiently emphasize the fact that the jury are not composed of lawyers, and that jurors are taught that it is their *duty* to receive from the judge what he characterizes as the law. When he lets the evidence come before them, the jury feel *bound* to consider it. If he does not give them some sort of cautionary instruction, they are almost sure to accept the evidence as true.

It is said in the majority opinion that "It is assigned that the court erred in refusing to give instruction No. 5 (requested), to the effect that, although the wife may have known the goods were stolen, this would not be sufficient to justify the jury in returning a verdict of guilty, although the defendant may have passively consented to what his wife had done without taking any part in the transaction. There was no evidence in the case to which such an instruction was applicable. No claim is made, and no one testified, that Mrs. Bloom ever purchased any goods. Instructions should have reference to the evidence in the case, and there was no error in this refusal."

It is true that there was no *direct* testimony to the effect that Mrs. Bloom purchased the goods, but the goods *were there in the store;* because of the fact that *they were there,* it would be easy for the jury to jump to the conclusion that whether Bloom was there or not when the goods were

brought into the store would make but little difference. The jury were likely to say: "Suppose Bloom's wife took these goods in, but Bloom let them stay there 'does not that make him guilty?" The trouble with that sort of reasoning would be that they would be holding Bloom liable for an assumed criminal act of his wife. The majority opinion refuses or neglects to consider Bloom's danger. As lawyers, the other members of this court know that one person should not be held liable for the wrong of another except in special cases and under special circumstances, which do not apply in this case. But they know *that* because they *are* lawyers, and because they have been trained by *years of experience* to know that; but the gentlemen who sat as jurors did not have those years of experience, and they would be wholly unable to determine what the law was unless directed. The district court did not direct them. It left them in the dark and where they could jump onto Bloom as responsible for the act that his wife had not done, but which they *might assume that she did.*

A's wife, in A's absence, receives stolen potatoes, knowing them to be stolen. The jury find that A afterwards adopted his wife's receipt. This finding is not sufficient to sustain a verdict of guilty, as it is consistent with A's having passively consented to what his wife had done without taking any active part in the matter. *Regina v. Dring,* 1 Dears. & B. C. C. (Eng.) 329. Chief Justice Cockburn said: "The word 'adopted' may mean that the husband passively consented to what his wife had done, without taking any active part in the matter. In that case we think it would not be right to say that he was guilty of receiving. True it may mean that he did take such active part, but we cannot put this rigid construction upon the word 'adopted;' and it would be going too far to say, upon this finding of the jury, that the conviction can be supported." The opinion was unanimous.

No instruction given by the court contained the idea set forth in this request. We should remember that the defendant is found guilty upon the theory of the prosecution that he *knew* that the goods had been stolen. The danger

is that the jury came to its conclusion that the property was stolen because the jurors thought that Mrs. Bloom may have believed that it was stolen. They may have further thought that it was the *duty* of the defendant . Bloom to make some sort of objection to it, although they may have considered that he was not present when the goods were brought into the store. The jury were likely to conclude that the act of the wife was the act of the husband, and, though performed in his absence, that it made no difference. In the consideration of this peculiar case, it was the duty of the trial judge to protect the defendant from the effect of any act of his wife. As I understand it, the majority opinion declines to look into the details of the case. The English case cited *looks in and acts.* Unless the testimony of the Bonners is accepted as true, there is no testimony against Bloom except that the goods were found in his store. I am unable to find any testimony that corroborates the testimony of Norman and Merle Bonner, and they dispute each other *all the time as* to *what* happened and *how* it happened. The testimony of the Bonners tends to show that they brought the goods to the store on the 21st of July. That seems to be their testimony, and that is the testimony of Mrs. Bloom. The defendant Bloom says that he was not there, and that he did not purchase the goods nor receive them, and four witnesses swear that on that Sunday he was out in the country all day. No one disputes the fact that he was out in the country all day on that Sunday except the Bonners.

The writer of the majority opinion may not believe in the Bonners generally, and this jury may have had the same impression; but if left at liberty to think the husband *adopted* the act of the wife, and so *was willing* to keep the goods, they may have thought they had the right to find the husband guilty, and that he properly was guilty. For this reason, there should have been an instruction as requested. In any event, there should be a new trial for this reason alone.

The questions asked the character witness on cross-examination were prejudicial. *People v. Huff*, 173 Mich. 620; *Elliott v. State*, 34 Neb. 48.

REESE, C. J., dissenting separately.

There was some evidence that, at the time the stolen goods were delivered at the store of defendant, he was not present and had no knowledge that they had been placed there until his return in the evening, when his wife informed him that she had given permission to have them left there temporarily by the person who had brought them and made the request that they be so left. With the weight of this evidence we have nothing to do. It is well settled by this and all other courts in this country that a litigant, whether in a civil or criminal case, has the right to have the jury instructed upon the issues and theories of each party, leaving the jury to decide the questions of fact. Upon the trial the defendant asked the court to instruct the jury: "Although the wife may have known or thought the goods, at the time she bought them, were stolen, this would not be sufficient to justify you in returning a verdict of guilty, though the defendant may have passively consented to what his wife had done without taking any active part in the matter." The instruction was refused, and no instruction given covering the proposition sought to be presented. We cannot say much in favor of the whole instruction as asked, but it is very clear that it presented to the court the well and long-established rule that the husband is not liable criminally for the acts of the wife in which he did not participate. I think the instruction should have been given (modified, if thought necessary), and to fail to do so was prejudicial and reversible error.